NEW OMAHA THOMSON-HOUSTON ELECTRIC LIGHT COM-
PANY v. EMMA M. JOHNSON, ADMINISTRATRIX OF THE
ESTATE OF CHARLES L. JOHNSON, DECEASED.

FILED FEBRUARY 4, 1903.   No. 12,557.

Commissioner's opinion, Department No. 1.

1. Evidence: FINDING: ACCIDENTAL DEATH.   Evidence *held* not to
support a finding that plaintiff's intestate came to his death
from accidentally stepping upon scrap iron electrically charged
from the wires of the electric-light company.

2. ————: VOLUNTARY CONTACT WITH GUY-WIRE.   Evidence *held* to
show that if fatal contact was with defendant's guy-wire, such
contact was voluntary, and after warning on deceased's part.

3. Guy-Wire: ELECTRIC CURRENT: REASONABLE PRECAUTION.   De-
fendant company *held* to be under a duty to exercise all reason-
able precautions against passing a dangerous current of elec-
tricity through a guy-wire attached to a pole on a vacant and
uninclosed lot in a densely peopled part of a city.

4. Attorney as Witness:   CONTINGENT FEE:   CROSS-EXAMINATION.
Where an attorney proffers himself as a witness and voluntarily
gives testimony in a case in which he admits having a con-
tingent fee, he should be required to answer on cross-examina-
tion as to the amount of such fee.

5. Intoxication: CONTRIBUTORY NEGLIGENCE: EVIDENCE: INSTRUCTION.
Where there is very slight evidence of intoxication, it is not
error to refuse an instruction telling the jury that contributory
negligence caused by intoxication would be a defense; the
court having fully instructed them as to what would constitute
contributory negligence.

ERROR from the district court for Douglas county.
Action in the nature of trespass on the case.   Tried below
before BAXTER, J.   *Reversed.*

*Isaac R. Andrews* and *Albert W. Jefferis,* for plaintiff
in error.

*Charles A. Goss* and *Thomas F. Lee, contra.*

Syllabus by court; catch-words by editor.

HASTINGS, C. .

July 15, 1900, Charles Johnson was killed by an electric shock obtained from a guy-wire attached to a pole maintained by the defendant company upon lot 2 in block 87 in the city of Omaha. This lot was uninclosed and unoccupied. There was no public alley through the block, but there was a pathway used by the public towards the west side, running from Dodge street north to Capitol avenue. It also appears that the vacant lot on which the pole was standing was sometimes used by teamsters in turning their wagons around, and a foot-path ran along its west side next to Burket's undertaking establishment, and foot-passengers crossed the lot in various directions toward Capitol avenue. The company's pole seems to have been about 100 feet south of Capitol avenue, and twenty feet north from the south end of the lot. This south end of the lot was bounded by a board fence. Between this fence and the pole was a pile of galvanized roofing, consisting, as one witness said, of half a load. Another said it was a light load for an express wagon. It is described as consisting of pieces eighteen inches square and smaller. The guy-wire had formerly been attached to a stump or stake about fifty feet southwesterly from the pole, but had been for some weeks detached, and the lower end coiled up and deposited in a box just south of the fence on top of which the wire rested. It seems to have rubbed against a wire carrying a heavy electric current until it had worn the insulation from the latter and had itself become charged with a powerful current. Plaintiff claims that the company was bound to know and guard against such danger. The guy-wire, on the day of the accident, rested on this scrap iron about fifteen feet south of the pole. It then passed along over such scrap iron, and up over the fence, and then down into a coil in the wooden box directly south of the fence. It is alleged that the plaintiff's intestate had no knowledge of electricity, and was unaware of any danger from contact with the wire

or with the scrap iron, and that while walking in the vicinity of the guy-wire, without negligence on his part, he stepped on some of the scrap iron and received a shock because of which he fell upon the pile of scrap iron and upon the wire, with fatal result. He was thirty-five years old, strong, vigorous, industrious and economical, and earning $60 per month. The action was brought by his widow on her own behalf and her young son's. The company denied that she was the widow or administratrix of Charles Johnson; admitted its ownership of the electric plant; denied the rest of plaintiff's allegations; and alleged that plaintiff's intestate was guilty of contributory negligence, without which his injury would not have been received. The reply denied such contributory negligence. The jury found for the plaintiff in the sum of $1,300. Motion for new trial was overruled, and from that judgment the company brings error.

Fifty-three assignments of error are laid in the petition. The brief filed on behalf of the company, however, complains only of error in refusing a peremptory instruction for the defendant at the trial; error in refusing to require plaintiff's attorney, who testified at the trial, to state on cross-examination the amount of his contingent fee; and error in refusing instruction 11 tendered on defendant's behalf, to the effect that if the jury should find that plaintiff's intestate was under the influence of liquor, which caused him to neglect ordinary precautions, and by that reason he came in contact with the wire and was killed, they should find for the defendant, even if they also found that the defendant had been negligent in regard to the guy-wire. The reasons why the defendant claims it was error to refuse its request for a peremptory instruction are summarized in counsel's brief as follows:

"1. The defendant, therefore, claims that because of the failure of the plaintiff to establish the allegation in his petition that he received his shock of electricity while walking in a pathway, by reason of his feet coming in contact with scrap iron, and for the further reason that

he was a mere licensee, to whom the defendant owed no duty, the court should have sustained the motion of the defendant to instruct the jury to return a verdict for the defendant.

"2. That the testimony fails to show that the alleged negligence of the defendant was the cause of the deceased's death.

"3. That the uncontradicted evidence of five witnesses, and the circumstances surrounding the whole transaction, show so clearly that the deceased came to his death owing to his own gross negligence and carelessness that no two reasonable minds could possibly differ in regard thereto, and the court should have given instruction No. 1 asked by defendant. For the above reason this judgment should be reversed."

The matters necessary to be determined in passing upon this case seem to be: First. Is the evidence sufficient to maintain plaintiff's claim that her intestate received an electric shock by his feet coming in contact with scrap iron as alleged? Second. If the evidence is sufficient to sustain that conclusion, was the condition of the wire and the scrap iron the result of negligence of any duty owed by the defendant to the deceased? Third. Does the evidence establish conclusively the contributory negligence of the deceased? Fourth. Was it error on the part of the trial court to reject the cross-examination of plaintiff's attorney as to the amount of his contingent fee, he having testified in the case? Fifth. Was it error on the part of the trial court to refuse the eleventh instruction, as to contributory negligence from intoxication?

An examination of the testimony submitted on the plaintiff's behalf compels the conclusion that the shock received by the deceased was not caused by an accidental stepping upon any of these pieces of galvanized iron which lay between the pole and the fence. The deceased had been engaged in moving his furniture that day. With the teamster who hauled it, Gust Nelson, he passed Nyberg's saloon, on Dodge street, south and a little west from this

guy-wire, and in the same block.  While there it appears
that information was brought in that an employee in
Norris's restaurant, next door east of the saloon, had re-
ceived a shock from this guy-wire.  The deceased and his
companion started north along the pathway across the
block, just west of the saloon which has been mentioned,
and the restaurant keeper, Norris, testified that he told
them not to go back there; that there was a live wire,
and that they would be killed.  Nelson neither admits
nor denies this statement.  They seem to have gone north
as far as the rear end of Burket's undertaking establish-
ment, which was at that time the first building west from
the lot on which this pole and guy-wire were situated.  The
fence along the south end of the latter lot commenced
some twelve or fifteen feet to the east of the southeast
corner of Burket's building.  To the east side of Burket's
building was, as stated, a pathway running north to Capi-
tol avenue.  Between the corner of the Burket building
and the fence was a pool of water.  It had been raining
very hard that day, as all of the witnesses agree, and the
day before.  The pool of water was an inch or so in
depth and two or three yards in diameter, and was close
to the west end of this fence.  The guy-wire rested on the
fence about four feet from i: ﹔ west end.  Nelson seems
to have stopped at some point outside of the vacant lot
where the pool stood, and west from the wire, and John-
son approached it from the west.  Nelson is either unable
or unwilling to say precisely how Johnson came in con-
tact with it, but knows that a few minutes later Johnson
was lying on the ground, with his feet still in this pool
of water, his head towards the east, face downwards,
with this guy-wire, and one hand at least, and perhaps
both of them, under him.  A lad in the neighboring build-
ing to the east says that his attention was attracted by a
loud report like that of a gun; that he looked out and
saw Johnson fall forward, and immediately ran to call
somebody, and found Mr. Bell and a policeman.  The
policeman does not testify, but the witness Bell declares

that while  Johnson was lying on the ground with the wire under him and his feet in this pool of water, so strong a current of electricity was passing through his body that when he took hold of Johnson's wet clothing he received a shock, and it gave out sparks; and when the policeman took hold of Johnson's pants it brought a strong discharge.  Johnson was finally pried off the wire with a dry board, and carried away.  There is no testimony that the scrap iron extended into the pool of water.  It seems clearly established that Johnson fell forward with his feet extending into that pool.  It seems clearly impossible that any shock could have been sustained by stepping upon one of these fragments of scrap iron lying upon ground saturated with water.  Of course, the shock could have been sustained by stepping upon scrap iron, which was itself in contact with the wire, only as the result of insulation both of the wire and the iron.  If either the wire or the iron was "grounded"— that is, was in contact with moist earth—it would be a better conductor than would the human feet and body, and no current through the latter capable of producing an injury would be so caused.  There is an entire failure to establish either the contact with the scrap iron or the latter's insulation, and no evidence from which the jury could find it, except the fact of the shock being received. Practically that much was admitted by plaintiff's counsel.  In order that the fact of the shock being received may furnish an inference that it came from the scrap iron, the supposition that it was otherwise obtained must be excluded.  That is far from being done.  Three witnesses swear in positive terms they saw the deceased walk up to and seize in his hands the guy-wire close to the point where it passed over the fence after resting upon the pile of scrap iron.  It seems impossible, under such circumstances, to sustain the jury in finding that the deceased received his injury from accidentally stepping upon a charged piece of the scrap iron.  Of course, deceased's taking up the wire in his hands, if it was resting on the

pile of scrap iron and he drew it away from such contact while his own feet were in the pool of water, would make his own body complete a ground circuit, and fully account for the shock that he received. It seems true that, as he lay, his body was partly upon the pile of scrap iron, but there is nothing to support the inference that the shock which threw him down there came from contact with it, and it does appear that as soon as his body was gotten off of the wire the current stopped, and there was no difficulty in removing him. It is clear that he fell forward with his feet still in the water, where a shock from stepping on scrap iron would be impossible.

The extensive argument of counsel that there was no duty owed by this electric-light company to the public to render its appliances and guy-wires on this vacant lot safe can hardly be sustained. The public was in the habit of passing back and forth across it in various directions, but principally along the path upon the east side of Burket's building, which came within fifteen or twenty feet of the pole and of the lower end of the guy-wire. It appears that the wire had been loosened and across the power wire for several weeks. There is evidence tending to show that an electrician in the employ of the company had discovered that the guy-wire was charged with a current nearly four weeks before this accident occurred.

While it is true that a bare licensee usually takes the risk of the premises as he finds them, yet he has rights. It is clear that the general public was licensed by its condition, and the practice which grew out of that condition, to pass over this lot. To throw, without warning, a deadly electric current down this guy-wire, would seem to be strictly analogous to running a licensee down without warning, which, it has been often held, may not be done.

The defendant's claim, that contributory negligence of the deceased conclusively appears, could hardly be maintained if the evidence was sufficient to warrant the jury in finding that he came to his death by stepping upon one of these pieces of roofing iron. If we were able to say that

the evidence warranted the jury's finding as to that, we would be compelled to say that it could not be held, as a matter of law, that stepping on such piece of iron was contributory negligence on the part of one ignorant of the dangers from electricity. The evidence going to establish contributory negligence is just as conclusive in favor of the proposition that he came to his death by voluntarily taking hold of the wire, as to which he admittedly had warning. It is, therefore, only by holding that the specific negligence alleged was not the cause of his death, and that the evidence does not support such a finding, that the contributory negligence can be held to be conclusively shown.

As we have held that the evidence is not sufficient to warrant any inference that he died from stepping upon an electrically charged piece of scrap iron, it seems to follow that it must be held that he voluntarily approached and seized the wire. It seems clear that the trial court should have instructed for a verdict in favor of the defendant upon this evidence, and that for this reason the judgment must be reversed.

It is not necessary, in this view of the case, to discuss the alleged error in refusing to allow the plaintiff's attorney, when produced as a witness, to be questioned as to the amount of his contingent fee. It would seem clear that, where an attorney proffers himself as a witness and admits that he has a contingent fee in the case, the jury are entitled to know and consider the amount of that fee as one of the circumstances affecting his credibility.

With regard to the instruction 11 tendered, the trial court seems to have instructed fully as to what would be the effect of contributory negligence if that question was to be submitted to the jury. Whether such contributory negligence was caused by intoxication or otherwise would seem not to be material. The proof of intoxication was very slight. One witness said that he seemed to have been drinking, and there is testimony of his having taken one glass of beer with the witness Nelson. It is

not thought that there was any error in refusing to give special prominence to this question of intoxication as tending to make probable the truth of the positive statements of the witnesses who were swearing to the deceased's voluntarily picking up the wire, when it clearly appears that he had full knowledge that one person had just received a severe shock, and that he was warned against it.

It is recommended that the judgment of the district court be reversed, and the case remanded.

LOBINGIER and KIRKPATRICK, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the case remanded.

REVERSED AND REMANDED.